Report of Expert Witness regarding the suicide of Maureen Bearden in the Bay County Jail on March 22, 2009

For: James V. Cook
314 West Jefferson Street
Tallahassee, Florida 32301
Attorney for Plaintiffs

By: Harvey Norris, MSW, LCSW
Tallahassee, Fl 32309
850-508-8104

**Date of Report: 05-25-2012**

My review is based on my review and analysis of the materials identified in this report regarding the suicide death of Maureen Bearden in the Bay County Jail on March 22, 2009, I have provided a statement of opinions, with supporting information regarding this case.

The following documentation was used in research and review in order to arrive at the opinions expressed in this report:

1) APA Task Force on Psychiatric Emergency Services Report and Recommendations Regarding Psychiatric Emergency and Crisis Services A Review and Model Program Descriptions August 2002, Michael H. Allen, M.D., Chair; Peter Forster, M.D.; Joseph Zealberg, M.D., Glenn Currier, M.D.

2) U.S. Department of Justice: Office of Justice Programs Suicide and Homicide in State Prisons and Local Jails Christopher J. Mumola BJS Policy Analyst August 2005, NCJ 210036

3) Bay County Jail Medical records from Corrections Corporation of America circa 2006

4) Maureen Bearden Death Investigation by Bay County Sheriff.

5) Florida State Hospital treatment records regarding Maureen Bearden.

6) River Oaks Hospital treatment records regarding Maureen Bearden.

7) Jail Health Services Progress Notes regarding Maureen Bearden

8) Clinical Interview with Children of Maureen Bearden, Elizabeth and Brooke Villella

9) Florida Suicide Prevention Plan 2005-2010.

10) Florida Statute Title XXXII, REGULATION OF PROFESSIONS AND OCCUPATIONS: Chapter 491; Clinical, Counseling, And Psychotherapy Services

11) The American Psychiatric Publishing Textbook of Suicide Assessment and Management, Second Edition; Edited by Robert I. Simon, M.D., and Robert E. Hales, M.D., M.B.A. 2012

12) Cynthia R. Pfeffer, M.D., Patricia Martins, M.A., Jackie Mann, M.S.W., Mary Sunkenberg, R.N., Amy Ice, M.D., Joseph P. Damore Jr., M.D., Cornelia Gallo, M.D., Ilana Karpenos, M.D., Hong Jiang, M.P.H. "Child Survivors of Suicide: Psychosocial Characteristics", Journal of the American Academy of Child & Adolescent Psychiatry, Volume 36, Issue 1, January 1997, Pages 65–74

13) Pompili, Maurizio; Lester, David; De Pisa, Eleonora; Del Casale, Antonio; Tatarelli, Roberto; & Girardi, Paolo. "Surviving The Suicides of Significant Others"; Crisis: The Journal of Crisis Intervention and Suicide Prevention, Volume 29, Number 1, 2008. pp. 45-48

14) S. Janet Kuramoto, MHSa, Elizabeth A. Stuart, PhDa,, Bo Runeson, MD, PhD, Paul Lichtenstein, PhD, Niklas Långström, MD, PhD, Holly C. Wilcox, PhD, "Maternal or Paternal Suicide and Offspring's Psychiatric and Suicide-Attempt Hospitalization Risk" PEDIATRICS Vol. 126 No. 5 November 1, 2010 pp. e1026 - e1032

15) Wright, Barry & Partridge, Ian, "Speaking Ill of the Dead: Parental Suicide as Child Abuse", Clinical Child Psychology and Psychiatry, April 1999 vol. 4 no. 2, pp. 225-231

16) Lamb, H. Richard, M.D. and Linda E. Weinberger, Ph.D., "Persons with Severe Mental Illness in Jails and Prisons: A Review," Psychiatric Services, April 1998, Vol. 49, No. 4.

17) Najavits, L.M. (2006). Seeking Safety. In V Follette & JL Ruzek (Eds.), Cognitive-Behavioral Therapies for Trauma (2nd ed.), pages 228-257. New York: Guilford.

18) Najavits L.M. (2003). Seeking Safety: A new psychotherapy for posttraumatic stress disorder and substance use disorder. In: Trauma and Substance Abuse: Causes, Consequences, and Treatment of Comorbid Disorders (P. Ouimette & P. Brown, Eds.), pages 147-170. Washington, DC: American Psychological Association Press. .

19) Linehan, M.M., Schmidt, H., Dimeff, L.A., Craft, J.C., Kanter, J., Comtois, K.A. (1999). Dialectical behavior therapy for patients with borderline personality disorder and drug-dependence. American Journal on Addiction, 8(4), 279-292.

20) Linehan, M.M., Heard, H.L. (1993) "Impact of treatment accessibility on clinical course of parasuicidal patients": Reply. Archives of General-Psychiatry, 50(2): 157-158.

**Expert Witness Qualification:**

My curriculum vitae is attached and my qualification include my education, work experience and post-graduate training.

I worked as a licensed clinical social worker since September 1993. I have provided clinical social work services, including assessment, evaluation, suicide assessment, suicide remediation and determination of suicide risk for the Florida Department of Corrections while contracted through Prison Health Services at Taylor correctional Institute and at the Leon County Jail for a period of 3 years. I have provided suicide assessment and intervention to the Leon county Juvenile detention Center for 2 years through Suwannee Social Services (previously AHM Counseling) from 2009 to the present.

I have performed multiple reviews of clinical documentation for Medicaid and Medicare audits and in 2007 was certified by the Florida Department of Juvenile Justice, Bureau of Quality Assurance as a Peer Reviewer for Residential and Non-Residential Programs. I have reviewed clinical and therapeutic documentation of several Secure Residential programs, focusing specifically on the quality and content of clinical notes and the determination of when notes were written in relationship to when they are dated.

I have written and/or edited six manuscripts on clinical social work since 2010. All are currently available and under publication.

**Prior Depositions and Testimonies:**

I have testified at deposition on 3-23-2011 for:
CASE NO.: 4:10-cv-81-RH/WCS
UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION:
DAVID CLEGG and SHARON ALLEN,
Plaintiffs,
v.
DEPARTMENT OF JUVENILE JUSTICE and GULF COAST TREATMENT CENTER, INC.,: ASHER ZASLAW, JOHANA PEREZ, KEITH WILLIAMS, KELBY RAMER, DONNA BAREFOOT, LOURDES QUIRAY, and ROBERT ELLIS,
Defendants.

**Issues in my research, which inform my opinion:**

The following standards relate to the care, which should have been provided to Maureen Bearden during her incarceration in 2009 at the Bay county Jail.

The APA Task Force on Psychiatric Emergency Services: Report and Recommendations Regarding Psychiatric Emergency and Crisis Services, 2002, addresses the responsibilities of providers and the level of care expected to meet current standards of care for suicidal individuals in a locked facility.

Patients who are not referred for care elsewhere after a screening assessment should receive a full psychiatric assessment. This assessment should be initiated within two hours of the patient's presentation to the service. All individuals who receive a psychiatric assessment must see a psychiatrist within 8 hours of presentation to the service. There must be a written process and procedure that ensures that those who require such an evaluation more urgently can be seen and assessed within fifteen minutes of that determination.

The assessment process includes:
1. Patient interview(s) by LIMHP's including board eligible psychiatrists trained in emergency psychiatric assessment and treatment;

2. Review of records of past treatment;

3. History gathering from collateral sources (see section on confidentiality);

4. Contact with the current mental health providers wherever possible;

5. A psychiatric diagnostic assessment which addresses any medical conditions that may cause similar symptoms or complicate the patient's condition;

6. Identification of social, environmental and cultural factors that may be contributing to the emergency;

7. An assessment of the patient's ability and willingness to cooperate with treatment;

8. A history of previous treatment and the response to that treatment that includes a record of past psychiatric medications, dose, response, side effects and compliance, 30 and an up-to-date record of all medications currently prescribed, and the name of the prescriber;

9. A general medical history that addresses conditions that may affect the patient's current condition (including a review of symptoms focused on conditions that may present with psychiatric symptoms or that may cause cognitive impairment, e.g., a history of recent physical trauma);

10. An appropriate physical health assessment (see below);

11. A detailed assessment of substance use, abuse and misuse conducted by an individual trained in assessing substance related disorders;

12. A treatment plan that addresses at least: immediate treatment in the service, the goals of such treatment, plans for aftercare, ways of addressing barriers to care.

**First Opinion:**

**The Bay County Sheriff and Health Authority failed to provide minimally adequate mental health treatment to Maureen Bearden.  Treatment, which was provided, was done so by an unlicensed mental health worker in violation of Florida Statutes.**

**Given Maureen Bearden's history of chronic and severe mental illness and her extremely elevated suicide risk, it is evident the mental health treatment was minimal and grossly lacking prior to her death by suicide.**

- The Bay County Sheriff and the jail staff as well as the mental health staff all had access to Maureen Bearden's prior mental-health history. One of the nursing staff provided services to Maureen Bearden during her 2006 incarceration as well as during her 2009 incarceration and was aware of her history of serious and chronic mental illness, since her childhood.  The mental health issues were secondary to a long history of rape and sexual abuse by multiple male perpetrators since the age of three and this history was known to Bay County Jail staff.  Staff was also aware of Maureen Bearden's concern about being sent back to Florida State Hospital in Chattahoochee, because of her report that she had been orally sodomized by a male staff member.

- Maureen Bearden's previous self injurious behavior at the Bay county Jail included
    - November of 2004:     cutting her wrists and throat.
    - December of 2005:     stabbing herself 28 times with an ink pen.
    - January of 2006:       Again cutting her face and neck
    - May of 2006:           seven separate self-harm incidents
    - February of 2007:      two more self lacerations
    - January of 2009:       hitting her head against the wall, hitting her stomach against the door, while pregnant.
    - February 2009:         stabbing herself and lacerating her body multiple times

- During her incarceration in 2009, she was first placed on suicide precaution on January 26, 2009 she was not seen by a mental health worker for more than 48 hours after being placed on suicide precaution. The first time she was seen by a mental health worker, was on January 28, 2009 at 9:30 AM.

- Documentation provided does not show that she received a psychiatric consultation. Instead her psychotropic medication was prescribed by Dr. Lippman, a Doctor of Osteopathy, with no documented training or experience in Psychiatry.

- Between January 26, 2009 and March 20, 2009 Maureen Bearden was placed on suicide watch three separate times and removed from suicide watch three separate times. During this time frame Maureen Bearden was seen by a mental health worker 31 times. Of those 31 times, 30 times the mental health worker was not licensed, and was practicing in violation of Florida statutes. The only time Maureen Bearden was seen by a licensed mental health professional was on March 17, 2009 when she was seen by Jack Howell, LMHC.

- It should be noted that even during the times Maureen Bearden was on suicide watch she received no mental health services over the weekends, as the Bay County Jail did not appear to have mental health coverage and staffing on the weekends. The mental health care she received during these 31 visits, was woefully inadequate.

- According to the APA task force on psychiatric emergency services, recommendations for psychiatric emergency and crisis services issued in 2002, there are 12 separate parts to a process for providing adequate and appropriate mental health care to people in psychiatric crisis for suicidal. It is important to note that it no time during the provision of services, was any documentation provided which would indicate that any of the 12 necessary steps in suicide assessment and prevention were completed by the mental health staff.

  - Mental health notes indicate that Maureen Bearden was not provided assessment and treatment by a licensed mental health professional as required.

  - There is no indication of a comprehensive review of past treatment records, no indication of gathering any history from collateral sources, no indication of contacting any prior or collateral mental health providers.

  - There is no indication that a psychiatric assessment was completed during her entire stay at the Bay County Jail.

  - There was no indication that any social, environmental or cultural factors were identified, and there was no assessment of the patient's ability and willingness to cooperate the mental health staff.

- There is no indication that mental health staff completed a review of prior psychiatric medications or that a general medical history was taken by staff.

- There is no indication that mental health staff sought out and reviewed any appropriate physical health assessment.

- There is no indication that mental health staff assessed any substance-abuse abuse or substance related disorder needs.

- There is no documentation or indication that the treatment plan was ever completed, signed, or completed for the record.

- The mental health notes that do exist, primarily handwritten by Mr. T. Jennings, are not only inadequate, they did not address any of the needs of a suicide assessment, nor did they allow a reviewer to locate any evidence of appropriate psychological, or mental health care.

**Second Opinion:**

**The Bay County Sheriff and Health Authority provided grossly inadequate care to Maureen Bearden during her incarceration in 2009 when compared to the care that was provided during her incarceration in 2004, 2006 and 2007.**

**Documentation of the care received when Corrections Corporation of America was in charge of the mental health and medical services were completed according to appropriate standards and meet all requirements of the APA Task Force on Psychiatric Emergency Services.**

**Had this level of care been provided to Maureen Bearden it is highly probable that she would still be alive.**

- The documentation of the services provided to Maureen Bearden consist of less than 114 entries, and the majority of these entries are less than three sentences long. Almost all are hand written and are often illegible. Approximately one quarter of these entries note issues not related to her mental health status. There is no indication of any notes which would clarify reasoning for Maureen Bearden being prescribed psychotropic medications and the expected outcomes.

- The documentation which clearly indicates Dr. Ronald Lippman, DO, removed Maureen Bearden from suicide watch does not indicate any objective information to justify the removal, and does not provide any discussion or rational for the action.

- There is no indication of any observation logs being kept on Maureen Bearden during her placement on suicide status in her 2009 incarceration. Observation

logs are standard documents used during the time a person is placed on suicide watch. Notations about behavior, actions and attitude are made every 5, 10 or 15 minutes depending on policy.

- During her 2004 incarceration, where she presented with a similar set of psychiatric concerns, Corrections Corporation of America (CCA) maintained more than 70 full sheet forms of observation logs, which detailed her behavior and interventions every 15 minutes.

- During her 2006 incarceration, where she presented with a similar set of psychiatric concerns, CCA maintained more than 25 full sheet forms of observation logs which detailed her behavior and interventions every 15 minutes.

- During her 2007 incarceration, where she presented with a similar set of psychiatric concerns, CCA maintained more than 53 full sheet forms of observation logs which detailed her behavior and interventions every 15 minutes.

- During her 2009 incarceration, where she presented with a similar set of psychiatric concerns, The Bay County Jail and Mental Health system, no longer provided services to its inmates through the medical staff of the Corrections Corporation of America (CCA). In her chart there were 0 (Zero) full sheet forms of observation logs which detailed her behavior and interventions every 15 minutes.

- Progression and quality of treatment is able to be monitored and reviewed during her 2004, 2006 and 2007 incarcerations, but the sheer lack of documentation during her 2009 incarceration make it impossible to prove she received any mental health care of any significance.

- It should be noted that during her incarcerations in 2004, 2006, 2007 and 2009, Maureen Bearden displayed similar sets of mental health distress and suicidal behavior. However, due to the level of care provided during the 2004, 2006 and 2007 incarcerations, Maureen Bearden was released from the Bay County Jail alive and well. The level of care provided during her 2009 incarceration was grossly lacking and Maureen Bearden did not survive her 2009 incarceration.

**Third Opinion:**

**Having reviewed thousands of mental health intervention notes for services provided in a variety of settings, and having been trained and certified by the Florida Department of Juvenile Justice, Bureau of Quality Assurance as a Peer Reviewer, I am able to assert the following finding.**

**The hand written mental health intervention notes completed by T. Jennings, MS, while he was an unlicensed mental health worker in violation of Florida Statute, were**
        **(1) grossly inadequate,**

      (2) **indicate no progression of treatment,**
      (3) **show no supervision or oversight by a Licensed Mental Health Professional,**
      (4) **are often illegible,**
      (5) **and show classic signs of having NOT been written within 24 hours of each visit, and**
      (6) **have classic indictors that they were written during a single session, possible after the suicide of Maureen Bearden, in order to present a specific picture and "clean-up" the record.**

- Services Progress Notes reveals that Mr. Jennings provided no therapeutic interventions that might have helped Ms. Bearden decrease her emotional distress.

- The notes document that he briefly monitored her status and encouraged her to behave so that she would be able to access the general population and standard jail privileges such as commissary.

- Review of the Florida State Professional Licensure records document that Mr. Jennings had no license that would allow him to provide mental health assessments or therapeutic interventions for Maureen Bearden.

- Services Progress Notes appear to be written using the same pen, in the same consistent and unhurried manner with similar portions being illegible.

- Services Progress Notes appear to use a wide range of verbiage, often colorful in nature, which is indicative of notes written sequentially, after the fact.

- Services Progress Notes record different issues and behaviors, and use non-standard jargon and abbreviations, which is often an indicator of notes recorded well after the intervention and recorded in a sequential fashion.

- Services Progress Notes reveal no attempt to provide any therapeutic interventions involving Cognitive Behavior Therapy techniques, or Dialectic Behavior Therapy techniques, both of which have been scientifically validated to provide relief from and ameliorate symptoms and feelings involved in suicidal individuals.

- At least one Services Progress Notes relates information identifying a care provider who provided a competency evaluation in the early 2000's rather than the care provider who completed the competency evaluation in 2009. This is indicative of a note recorder who has a substandard knowledge of the details of a client chart and mistakenly identifies the wrong provider when writing notes well after the intervention.

**Fourth Opinion**

**The substandard care provided by The Bay County Sheriff's Department and which lead to the suicide of Maureen Bearden will have serious and prolonged psychological and physical health effects on her two surviving Daughters, Elizabeth, currently age 10 and Brooke, Currently age 8.**

Kuramoto, Et al. (2010) shows a clear increase in the risk of suicide-attempt hospitalization of children and adolescents survivors of maternal suicide. The study also indicates a significant risk of increased depression and anxiety requiring hospitalization, of child survivors of maternal suicide.

According to Erik Erikson developmental model, which is a standard model widely accepted in the field of clinical psychology and clinical social work, the developmental trials, which will be faced by the surviving daughters between the ages of 12 and 18, a stage known as Identity vs. Role Confusion, have been shown to be greatly impacted in a negative manner, for child survivors of maternal suicide. Because this is the stage of development, upon which all adult development ultimately rests, it is imperative this stage be successfully completed. Survivors of maternal suicide enter this stage with many handicaps and generally have extremely elevated rates of misbehavior, failure to develop appropriate and sustainable identities, and increased risks of suicide and boundary violating behavior. Both surviving daughters are at risk of an identity development disorder which could lead to poor and dangerous choices in their future stages of development. Both daughters should have constant and substantial access to mental health counseling and services during their teenage years and should be monitored for safety and health reasons.

Both daughters show clear signs of loss and feelings of having been betrayed by their mother's suicide. They also are aware of the loss of their young sister, Bridget Nicole Bearden, who would have been born in midsummer, had Maureen Bearden survived her incarceration. This loss of their sibling will play a larger role in their life and will be a focal point for delayed grief and questioning as the children move into the identify phase of their emotional development.

Elizabeth shows signs of detachment and unconscious anxiety as she is able to clearly remember her mother and is extremely confused about "why did mommy leave." She is able to understand her loss on a specific level, however, the loss of her mother and all the maternal bond represents, is quite likely to have very serious effects on her development and future behavior. Without extensive and on-going psychotherapy between her current age and roughly age 25, these effects will most likely be detrimental to her and may follow her throughout her entire life.

Brooke, the 8-year-old survivor shows clear indication of excessive anger at the loss of her mother. This is common given her age at the time of her mother's death and will need to be addressed in psychotherapy prior to her entering her identity phase. While she remembers her mother, she is not at the stage of development where she can

understand her mother's disappearance. Brooke operates in a more concrete format currently and will probably do so for the next 2 years. When she progresses to the next stage of development, without extensive psychotherapy, she will most begin to develop the similar propensity for development damage, as currently experienced by her sister, Elizabeth.

**Summary and Conclusions**

To summarize the opinions that have been delineated, the Bay County Sheriff and Health Authority failed to provide even basic mental health care to Maureen Bearden during her 2009 incarceration.

This lack of the provision of even minimal standards of care resulted in the death of Maureen Bearden, which could have been prevented. The 2009 incarceration of Maureen Bearden was not the only time the Bay County Sherriff has contact with her and her mental health needs were extremely well known by staff, due to her 2004, 2006 and 2007 incarcerations, which she survived.

Had Maureen Bearden received the level of care she had received during her previous incarcerations, it is quite likely that she would have survived her 2009 incarceration.

The Mental Health services provided by T. Jennings, MS, as an unlicensed provider, were grossly inadequate and his lack of apparent access to a clinical supervisor with the appropriate knowledge and skills to assist Maureen Bearden had a direct impact on Maureen Bearden's chances of completing her 2009 incarceration alive.

Handwritten clinical mental health notes by T. Jennings, appear to have been written after the events they represent and appear to have been written sequentially. There are clear indications that the notes do not meet the basic standard of care required to document treatment efficacy.

The suicide of Maureen Bearden will have a direct and clinically significant negative impact on her two surviving daughters. Her daughter's development and successful growth into productive adult roles will be severely impacted by her death. Mental health assistance willibe needed for the daughter for years to come.

**The compensation to be paid for the report:**

My rate of compensation for research and review for this project is $75 an hour with $150 per hour for court testimony and deposition with a four-hour minimum, based on my allocation of time, and reasonable expenses for travel, food, and lodging.

Kindest Regards,

*[signature]*