IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

**JAMES BEARDEN as Personal**
**Representative of the estate of**
**Maureen Beardem, and on behalf**
**of the Survivors, Elizabeth and**
**Brooke Villella, and James Bearden,**

    **Plaintiff,**

v.                                                                          CASE NO. 5:11-cv-316-RS-EMT

**HON. FRANK McKEITHEN, as**
**Sheriff of Bay County, Florida, and RICK**
**ANGLIN and RONALD LIPPMANN, in**
**their individual capacities,**

    **Defendants.**
_____/

## ORDER

Before me are Defendants McKeithen and Anglin's Motion for Summary Judgment (Doc. 41) and Plaintiff's Response in Opposition (Doc. 52). Defendant Lippmann has previously been voluntarily dismissed.

### I. STANDARD OF REVIEW

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S. Ct. 2505, 2512 (1986).

The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Thus, if reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)). However, a mere 'scintilla' of evidence supporting the nonmoving party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 251).

## II. BACKGROUND

I accept the facts in the light most favorable to Plaintiff. *See Galvez v. Bruce*, 552 F.3d 1238, 1239 (11th Cir. 2008) (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1343 n.1 (11th Cir. 2002)). "'All reasonable doubts about the facts should be resolved in favor of the non-movant.'" *Id.* (quoting *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999); *Clemons v. Dougherty County*, 684 F.2d 1365, 1368-69 (11th Cir. 1982).

On Sunday, March 22, 2009, Maureen Bearden ("Decedent") committed suicide while detained in the Bay County Jail. She had created a noose by looping a bed sheet through a door grate and was discovered by prison staff at 8:57 p.m. hanging in her cell. She was pronounced dead at Bay Medical Center at 10:22 p.m. the same day. Defendant McKeithan, Sheriff of Bay County, had assumed operation of the jail in October of 2008 after a long-term contract with Corrections Corporation of America ("CCA") was terminated. Defendant Anglin was the Warden at the jail beginning in October of 2008.

Decedent was booked into the Bay County jail on January 25, 2009. An Initial Intake Screening was performed which indicated that she had made numerous suicide attempts in the past, including while previously incarcerated in the Bay County Jail. For example, in December of 2005, Decedent was placed on suicide precautions[1] for four days because she repeatedly stabbed herself with an ink pen. She was placed on suicide preventions several times in 2006 through 2008 during multiple, separate periods of incarceration and engaged in several documented self-harm attempts during this span.

At the time of intake on January 25, 2009, Decedent indicated that she was currently thinking about harming or killing herself. Between this date and her

---

[1] The jail has at least three different types of special observations that prisoners can be placed on, including suicide precautions, medical observation, and behavioral observation. *See* Doc. 56-3, Deposition of Rick Anglin.

successful suicide on March 22, 2009, Decedent was placed on suicide precautions three times for a total of 31 days. Her last discharge from suicide observation status was on March 9, 2009. The evening of her suicide, a nurse who was passing out medication around 8:00 p.m. noted that Decedent was "showing out" and "not happy." Decedent gave a note to the nurse which stated "I'm not going to hurt myself anymore. I'm going to start hurting the people that has (sic) hurt me instead of myself." Other inmates heard Decedent pounding on her cell door and shouting for a prolonged period, beginning around 6:00 p.m. Doc. 56-13. The shift supervisor, Lieutenant Smith, called David Sasser, the health services administrator,[2] conveying to him essentially that Decedent needed more attention than jail staff could give her and needed to be removed from the jail. Mr. Sasser advised Mr. Smith that mental health staff would talk to Decedent. Doc. 56-4, Pg. 11, Expert Report of Richard Hayward, Ph.D.

During her roughly two-month incarceration in 2009, Decedent was assigned to mental health counselor Timothy Jennings. Jennings was not a licensed mental health counselor, but had earned a master's degree in mental health counseling. Doc. 42-1, ¶ 6, Affidavit of Rick Angler. During her final phase off of suicide watch (March 9, 2009 through March 22, 2009), Decedent was visited by Jennings five times. Doc. 42-10. She was also visited once by licensed mental

---

[2] *See* Doc. 65-3, pg. 43, Deposition of Rick Angler.

health counselor Charles Howell. Doc. 42-10. According to Plaintiff's mental health expert, these and other visits from Jennings amounted to "no more than monitoring from a mental health staff member who was not licensed to practice therapeutic interventions and had no training in interventions appropriate for individuals with Borderline Personality Disorder, Bipolar Disorder, and Posttraumatic Stress Disorder." Doc. 56-4, pg. 9-10, Expert Report of Richard Hayward, Ph.D. Further, "the sheer lack of documentation during her 2009 incarceration make it impossible to prove she received any mental health care of any significance." Doc. 56-5, pg. 8, Expert Report of Harvey Norris, LCSW. Mr. Norris found that Jennings' notes regarding his visits with Decedent were "grossly inadequate" and "indicate no progression of treatment." Doc. 56-5, pg. 8-9.

## III. ANALYSIS

**Count I: Claims under 42U.S.C. 1983 against Hon. Frank McKeithen**

Plaintiff claims that Decedent's estate and survivors are entitled to relief against Defendant McKeithen under 42 U.S.C. § 1983, based on violation of the Fourteenth Amendment to the U.S. Constitution, because Decedent was denied needed medical care and her mental health issues were not timely and properly assessed and treated. Complaint, ¶¶ 83-84. In the Eleventh Circuit, "to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that

constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). The claim against Sheriff McKeithen in his official capacity is governed by this standard. "A policy may be deliberately indifferent . . . where the policy is implemented with 'deliberate indifference as to its known or obvious consequences.'" *Fields v. Corizon Health, Inc.*, 11-14594, 2012 WL 3854592 (11th Cir. Sept. 6, 2012) (citing *McDowell,* 392 F.3d at 1291). Under attack here is what Plaintiff alleges was a policy or custom of failing to provide treatment for inmates with severe mental health needs and suicidal tendencies, the consequence of which would be the ultimate suicides of inadequately treated inmates. Complaint, ¶¶ 85-86.

    In a case involving two suicides the same jail cell approximately a year apart, an Alabama district court determined that "in jail suicide cases involving conditions of confinement, the appropriate inquiry is whether jail conditions and past events made it so obvious that suicide would result from the county's failure to modify its jail facilities that the county could be seen as deliberately indifferent to the interests of all detainees." *Vinson v. Clarke County, Ala.*, 10 F. Supp. 2d 1282, 1301 (S.D. Ala. 1998). While at issue in this case is the provision of mental

6

health services rather than the physical conditions of the jail cell which housed Decedent at the time of her suicide,[3] the same standard can logically be applied.

    Plaintiff avers that there was ample notice of a problem of past suicides involving the same policies and many of the same personnel at the Bay County Jail, so the Sheriff's failure to improve the mental health services constitutes deliberate indifference.  However, Defendant Anglin's affidavit asserts that he was concerned about the adequacy of the care provided to people with mental health issues during CCA's operations of the facility, so at the beginning of his and

---

[3] In Plaintiff's response to Defendants' motion for summary judgment, he claims that "the metal mesh door of decedent's prison cell furnished an accessible and inviting tool for suicide" and that "defendants were aware that inmates were taking advantage of this tool and chose to do nothing to stop them," constituting deliberate indifference. Doc. 57, pg. 21.  However, Count I of the Complaint alleges only inadequate provision of mental health services, not dangerous design of the jail.  Further, the case cited by Plaintiff involved two prison suicides by hanging and evidence showed that there were three successful suicides by hanging in a six-month span in a county jail.  *See Title v. Jefferson County Comm'n*, 966 F.2d 606, 608 (11th Cir. 1992) *reh'g granted and opinion vacated*, 986 F.2d 1384 (11th Cir. 1993) and *on reh'g*, 10 F.3d 1535 (11th Cir. 1994).  This decision was vacated, and on rehearing the Eleventh Circuit affirmed the district court's grant of summary judgment, holding that "'the deliberate indifference standard is met only if there were a 'strong likelihood, rather than a mere possibility,' that self-infliction of harm would result' from the defendant's actions or inaction. The fact that one suicide occurred before Tittle committed suicide and two suicides occurred before Harrell committed suicide, without more, did not increase the possibility of suicide to a strong likelihood." *Tittle v. Jefferson County Comm'n*, 10 F.3d 1535, 1541 (11th Cir. 1994) (quoting *Edwards v. Gilbert,* 867 F.2d 1271, 1276 (11th Cir.1989)) (citations omitted).  Accordingly, even if Plaintiff's complaint had raised the danger of the metal mesh as part of its constitutional claim against the Sheriff, a trio of suicides more than a decade earlier would not increase the possibility of suicide to the strong likelihood which is necessary to a finding of deliberate indifference.

Sheriff McKeithen's tenure operating the jail he ended the practice of outsourcing mental health services to an outside provider and brought in an in-house staff.[4] Doc. 42-1, ¶ 6, Affidavit of Rick Anglin.  There was no option for suicidal inmates who could not be properly treated by the in-house staff to be placed at an outside acute care facility for stabilization which would prevent suicide.  Instead, suicidal inmates were placed on suicide precautions.  *See* Doc. 56-3, pg. 61, Deposition of Rick Angler; Doc. 56-4, pg. 10-11, Expert Report of Dr. Richard Hayward, Ph.D.  During CCA's management of the jail, there were three successful suicides, all in the mid-1990s.  Doc. 56-3, pg. 21, Deposition of Rick Anglin.  Decedent's suicide is the only suicide that has occurred at the jail since Sheriff McKeithen assumed responsibility of it. Doc. 42-1, ¶ 5.

    Many of the policies and procedures of CCA remained in place at the time of Decedent's suicide, including the suicide management policy.  That policy remained in place until April of 2009 following Decedent's suicide.  Doc. 56-16, pg. 5-6, Deposition of Rick Anglin.  The new policy contains three levels of

---

[4] Anglin stated that "[o]ne of the primary problems with [the outsourced mental health services was] that the time from when an inmate was initially determined to need some kind of mental health assessment or treatment, the delay in the amount of time that it took to get a psychiatrist out to the facility to address that was just -- it was unacceptable. I did not feel comfortable with that." Doc. 56-3, pg. 20, Deposition of Rick Anglin.  After Sheriff McKeithen took over responsibility of the jail, Anglin immediately changed the mental health provision system so that mental health counselors were required to see inmates immediately upon intake if there was a mental health referral issued at intake.  *Id.* at 22.

suicide precautions, which allows jail staff to better assess inmates on suicide precautions and provide the inmates privileges that would be available in the general population while still being monitored in a controlled setting. *Id.* at 7. Plaintiff asserts that a multi-level suicide watch plan was an industry standard and the failure to have one in place at the time of Decedent's suicide constitutes deliberate indifference. To counter the charge of deliberate indifference, Sheriff McKeithen points out that after Decedent's suicide, Defendant Anglin had the metal mesh removed from jail cells and video cameras installed in order to prevent suicides and also introduced the new written suicide prevention protocols.[5] Doc. 42-1, ¶ 7.

While there was an unfortunate failure of suicide prevention policies in this case, it is clear from the evidence that Sheriff McKeithen was not deliberately indifferent to the risk of suicide of inmates such as Decedent. The most recent suicide had been more than a decade earlier, and McKeithen had taken over control of the jail from CCA partly because of his desire to address the deficient mental health care provision during CCA's management. The mental health care services

---

[5] Defendants argue that while subsequent remedial measures are inadmissible to show a breach of duty under Federal Rule of Evidence 407, they can be used defensively to show absence of deliberate indifference. Plaintiff claims that they may also be used to show feasibility. However, the feasibility of making physical changes to the jail cells and of implementing an improved suicide prevention plan is not controverted.

had been brought in-house so that inmates would be seen and treated much more quickly than they had when the services were outsourced.  In sum, it cannot be said that past events made it so obvious that suicide would result from the county's failure to modify its procedures and facilities that Sheriff McKeithen was deliberately indifferent.  Accordingly, Sheriff McKeithen is entitled to summary judgment on Count I.

## Count II: Claims under 42 U.S.C. 1983 against Rick Anglin

Plaintiff claims that Decedent's estate and survivors are entitled to relief against Defendant Anglin under 42 U.S.C. § 1983, based on violation of the Fourteenth Amendment to the U.S. Constitution because Decedent was denied needed medical care and her mental health issues were not timely and properly assessed and treated. Complaint, ¶¶ 94-95.  Anglin claims that he is entitled to qualified immunity, which insulates government officials from personal liability for actions taken pursuant to their discretionary authority.  According to the Supreme Court, "'government officials . . . generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Greason v. Kemp*, 891 F.2d 829, 833 (11th Cir. 1990) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).  A constitutional right is violated when

there is deliberate indifference to the serious need for psychiatric care. *Greason*, 891 F.2d at 833-34.

"To establish liability for a prisoner's suicide under section 1983, 'the plaintiff must show that the jail official displayed deliberate indifference to the prisoner's taking of his own life.'" *Gish v. Thomas*, 516 F.3d 952, 954 (11th Cir. 2008) (quoting *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005)) (internal quotations omitted). "The plaintiff must prove that the official had subjective knowledge of a risk of serious harm and disregarded that risk by conduct that constituted more than mere negligence." *Gish*, 516 F.3d at 954 (citing *Snow ex rel. Snow v. City of Citronelle, Ala.*, 420 F.3d 1262, 1268 (11th Cir. 2005)). "'Deliberate indifference requires that the defendant deliberately disregard a strong likelihood rather than a mere possibility that the self-infliction of harm will occur.'" *Gish*, 516 F.3d at 954 (quoting *Cook*, 402 F.3d at 1115) (internal quotations omitted). "To be deliberately indifferent to a strong likelihood that the prisoner will commit suicide, the official must be subjectively aware that the *combination* of the prisoner's suicidal tendencies and the feasibility of suicide in the context of the prisoner's surroundings creates a strong likelihood that the prisoner will commit suicide." *Gish*, 516 F.3d at 954-55. On the other hand, "[w]here prison personnel directly responsible for inmate care have knowledge that an inmate has attempted, or even threatened, suicide, their

failure to take steps to prevent that inmate from committing suicide can amount to deliberate indifference." *Greason*, 891 F.2d at 835-36.

Anglin was not present at the jail when Decedent committed suicide and he did not personally participate in decisions regarding her medical treatment, observation status, or cell assignment during her detention in 2009. Doc. 42-1, ¶ 3-4. Thus, it cannot be said that he was subjectively aware of the combination of Decedent's suicidal tendencies and the feasibility of her suicide while under behavioral observation. Accordingly, Anglin was not deliberately indifferent and thus is entitled to qualified immunity and, consequently, summary judgment on Count II.

## Count IV: Claims under the ADA and Rehabilitation Act against Hon. Frank McKeithen

Plaintiff claims that Decedent's estate and survivors are entitled to relief against Defendant McKeithan for disability discrimination pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., (hereinafter "ADA"). Complaint, ¶ 112. Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act of 1973 ("RA") provides that "[n]o otherwise

qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.  The ADA and Rehabilitation Act claims are considered together and pursuant to the same standard because, "cases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa." *Cash v. Smith*, 231 F.3d 1301, 1305 n.2 (11th Cir. 2000). The ADA's prohibition of disability discrimination applies to state prisoners. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).

The issue here is whether Decedent was "denied the benefits of the services, programs, or activities" of the Bay County Jail.  In the Complaint, Plaintiff alleges that Decedent, because of her lack of treatment and adequate supervision, was denied certain opportunities that other inmates enjoyed, such as the opportunity to interact with other inmates, form friendships, move at liberty within set bounds, make phone calls, use educational facilities, and engage in religious activities. Complaint, ¶¶ 121a-e.  Thus, there are two layers of depravation alleged: the depravation of treatment and supervision and the resulting depravation of participation in the same activities that other inmates enjoyed.  To begin with, "the ADA 'would not be violated by a prison's simply failing to attend to the medical

needs of its disabled prisoners.'" *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005) (quoting *Bryant v. Madigan,* 84 F.3d 246, 249 (7th Cir.1996)).  Accordingly, the failure to provide adequate medical care for Decedent's mental illnesses is not by itself an ADA or RA violation.

As for the denial to Decedent of privileges enjoyed by other inmates, Plaintiff must show that they were denied to Decedent by reason of her disability. Plaintiff asserts that Decedent suffered from bipolar disorder and Post Traumatic Stress Disorder.  Complaint, ¶ 114.  There is nothing in the record that indicates that an inmate who is not disabled and who is placed on suicide precautions would have received any more privileges than did Decedent.  Nor is there anything in the record indicating that any other inmate placed on behavioral observation, as was Decedent at the time of her suicide, would have enjoyed any more privileges than she did.  It is not the case that Decedent was targeted for different treatment than the main prison population because of her illnesses, but rather her treatment was the same as for other, non-disabled inmates who had the same observation status. Accordingly, there is no cognizable claim under the ADA or the RA and Sheriff McKeithen is entitled to summary judgment on Count IV.

## IV. CONCLUSION

Defendants' Motion for Summary Judgment (Doc. 41) is **GRANTED** as to Counts I, II, and IV.  Because summary judgment has been granted for all of Plaintiff's federal claims, this Court declines to exercise supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3).  The Clerk is directed to close the case.

**ORDERED** on September 10, 2012.

>  /s/ Richard Smoak
>  **RICHARD SMOAK**
>  **UNITED STATES DISTRICT JUDGE**